IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO.: 5:25-cv-625-FL

| | |
|---|---|
| J.R. by and through his parents, NATHANIEL RYAN & JESSICA RYAN,<br><br>Plaintiff,<br><br>v.<br><br>WAKE COUNTY BOARD OF EDUCATION,<br><br>Defendant. | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

NOW COMES Plaintiffs J.R., by and through his parents Nathaniel Ryan and Jessica Ryan, by and through their undersigned counsel, and pursuant to Local Civil Rule 7.1(e), E.D.N.C., and hereby submit this Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

## STATEMENT OF THE CASE

This is a case about J.R., a public-school student with a disability who, while at Wake County Public Schools System ("WCPSS"), was deprived of appropriate supports necessary to access his education, over several months, and was inappropriately physically restrained. Without the ability to access his education, and suffering from the physical and emotional harms accompanying his prior incidents of restraint, J.R. eventually disenrolled from WCPSS. Plaintiffs initially filed a petition for contested case hearing (hereafter "Petition") against WCPSS, which resulted in an accepted offer of judgment, in which WCPSS was to provide a specified amount of

services. Those services were never provided. On October 1, 2025, Plaintiffs filed an initial complaint alleging, seeking, among other claims, recovery for the breach of this settlement agreement and for multiple harms J.R. suffered while at WCPSS. On January 28, 2026, Plaintiffs filed an Amended Complaint, which Defendant moved to dismiss in its entirety on February 25, 2026.

## STATEMENT OF RELEVANT ALLEGED FACTS

At the time of the alleged incidents, J.R. was ten years old, five feet tall, and weighed seventy pounds. DE 25 ¶¶ 77-78. During the 2022-2023 through 2023-2024 school years, J.R. attended Wake County public elementary schools. *Id.* at ¶ 79. While enrolled in WCPSS, J.R. required significant support to access his education. *Id.* at ¶ 83. His diagnoses at the time included the following: Attention Deficit Hyperactivity Disorder, Combined Presentation; Sensory Processing Disorder and Executive Functioning Deficits; Social (Pragmatic) Communication Disorder, secondary to Autism; and Disorder of Written Expression. *Id.* J.R. was entitled to receive necessary support and services to address his disabilities so he could have equal access to the general educational curriculum. *Id.* WCPSS was aware of J.R.'s disabilities and that his disabilities often manifested as maladaptive behaviors when not appropriately addressed. *Id.* at ¶¶ 80, 83, 87-88, 99, 101, 104, 106.

During the 2022-2023 school year, WCPSS did not provide appropriate services to J.R., which led to at least two incidents of restraints that left J.R. so traumatized he switched schools. *Id.* at ¶¶ 91-93. On February 15, 2023, WCPSS staff restrained J.R. after he refused to stop playing with a foam soccer ball. *Id.* at ¶ 99. The restraint left J.R. with bruises on his arms and hips. *Id.* J.R.'s sensory processing disorder makes him very sensitive to touch. *Id.* WCPSS's use of aggressive restraints triggered his disorder, escalated the situation, and traumatized J.R. *Id.* Again,

on March 15, 2023, WCPSS staff aggressively restrained J.R. due to his behavior to the point that he "suffered a nosebleed and other physical injuries from being thrown against the wall and squeezed very tightly." *Id*. at ¶ 101. The experience traumatized J.R. *Id*. at ¶ 115-16. Mr. and Mrs. Ryan then filed a lawsuit against WCPSS for using aggressive restraints against J.R. as disciplinary measures rather than following his IEP and BIP to de-escalate the situation. *Id*. at ¶¶ 55, 59, 106, 111-12. Additionally, after each incident, Mrs. Ryan would notify WCPSS staff that the restraints negatively affected J.R. *Id*. at ¶ 311. Mrs. Ryan also submitted a complaint to the local police department and Disability Rights for North Carolina regarding J.R.'s restraints. *Id*. at ¶¶ 100, 102-03, 105; DE 25-1 at 1.

On June 9, 2023, Mr. and Mrs. Ryan met with Jennifer Holmes, who conducted a functional behavioral assessment of J.R. *Id*. at ¶ 197. Ms. Holmes made recommendations to address J.R.'s behaviors and ensure he could access the educational curriculum. DE 25 ¶¶ 196-97. Notably, Ms. Holmes concluded J.R. "will require the support of a one-on-one assistant who has received training in applied behavioral analysis, such as a registered behavioral technician" to access the educational environment. *Id*. Ten days before the due process hearing concerning the restraining of J.R. and adequacy of his services, WCPSS offered the following to settle the case: 846 hours of compensatory services that would expire June 1, 2025, RBT training to staff, and a BCBA to observe J.R. during the school year. Both parties agreed to the settlement on September 1, 2023. *Id*. at ¶ 54; DE 25-3.WCPSS did not provide J.R. with all of the agreed to services and accommodations. DE 25 ¶ 59. On September 26, 2023, WCPSS staff again restrained J.R. for refusing to stop playing basketball despite knowledge the restraints harmed J.R., were not a part of his safety plan or BIP, and aggravated him more. *Id*. at ¶¶ 94, 104, 114-18. On October 25, 2023, staff restrained J.R. once again. *Id*. at ¶ 106. Afterwards J.R. was so traumatized he refused

to go to school. *Id*. at ¶¶ 106, 114-18. According to J.R. he felt like school staff was trying to "kill" him. *Id*. at ¶ 106. The failure to provide the necessary support and services J.R. needed led to the repeated and aggressive restraint of J.R., his school refusal, and later Post Traumatic Distress Disorder diagnosis. *Id*. at ¶¶ 91-93, 196-97, 106, 114-19.

## RELEVANT LEGAL STANDARD

The Federal Rules of Civil Procedure authorize complaint dismissal when it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A 12(b)(6) motion challenges solely the legal sufficiency of the complaint, assuming the facts alleged in it are true. *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Deciding a 12(b)(6) is a pure question of law, which simply inquires whether the complaint alleges sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Because Rule 12(b)(6) specifies no other ground for granting a motion to dismiss, it follows that it can be granted only if the complaint on its face fails to state a plausible claim upon which relief can be granted." *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026). In deciding the motion, the court "accept[s] as true all well-pleaded facts" in the complaint and exhibits "and construe them in the light most favorable" to the plaintiff. *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017).

## ARGUMENT

### I. Plaintiffs Do Not Need to Exhaust Administrative Remedies for a Breach of Settlement Claim.

Plaintiffs who allege breach of settlement need not exhaust if the claim does not require a FAPE analysis. FAPE claims are those that relate to the "identification, evaluation, or placement of a child." 20 U.S.C.S. § 1415(b)(6)(A). Determining if a claim requires a FAPE analysis depends on the nature of the pleadings. *See H.C. v. Colton-Pierrepont Cent. Sch. Dist.*, 341 Fed

Appx. 687, 690-91 (2d Cir. 2009**)** (jurisdiction over breach of settlement made outside mediation and resolution when failure to provide agreed upon chair, computer, and software did not concern the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."). When the dispute hinges around "whether Defendant failed to provide [the services]" and "no special expertise interpreting and applying the IDEA or additional fact-finding regarding [the student's] abilities and educational goals is required," the claim is one for breach of contract. *Mikis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d. 960, 989-90 (N.D. Ill. 2017) (finding jurisdiction over settlement made outside mediation and resolution). Likewise, without a dispute about the appropriateness of placement or the child's educational needs, a settlement dispute is a contractual interpretation matter. *D.B.A. v. Special Sch. Dist. No. 1*, No. 10-1045, 2010 U.S. Dist. LEXIS 134525 at *8 (D. Minn. 2010).

This Court has jurisdiction because J.R.'s breach of settlement claim does not relate to the "identification, evaluation, or placement of a child." 20 U.S.C.S. § 1415(b)(6)(A). Per the September 1, 2023, settlement agreement, Defendants offered "2 hours of parent training and counseling," DE 25-3 at 3, "60 hours of extended school year services," DE 25-3 at 3, "42 hours of occupational therapy services, 84 hours of speech and language services, 210 hours of math instruction, 279 hours of behavioral social-emotional instruction, and 21 hours of counseling," DE 25-3 at 2-3. Defendants agreed to deliver these services at a "mutually agreeable time" by June 10, 2025. *Id*. at 3. Plaintiffs alleged Defendants failed to provide these services and acted in bad faith when they did not take the requisite steps to hire personnel to provide the services to J.R. Plaintiffs now seek the value of the contract in monetary damages for the services Defendants did not provide. *Id* at ¶¶ 255-57, 270.

This Court must merely determine (1) Defendant had an obligation to provide the agreed-upon services and (2) Defendants failed to provide those services. The facts in this case are most analogous to those in *H.C.* 341 Fed Appx. 687. In *H.C.* the Defendants agreed to provide a chair, computer, and software as accommodations per a settlement agreement reached outside of mediation and resolution. *Id.* at 690-91. Here, Defendants agreed to provide specified hourly services to J.R pursuant to a ten-day offer. DE 25-3. And like *H.C.*, in which Defendants failed to provide those services at all, Defendants failed to provide services to J.R. per the settlement agreement. *H.C.*, 341 Fed Appx. at 690-91; DE 25 at ¶¶ 255-57, 270. Plaintiffs do not allege that the services were inappropriate or denied J.R. FAPE. *Id*. at ¶¶ 255-57, 270. Here, Defendants contracted to provide those services, failed to act in good faith to find personnel to provide those services, did not provide the services, and therefore breached the settlement agreement. *Id*. at ¶¶ 255-57. Thus, because this Court need not determine if J.R. received appropriate services and because OAH cannot enforce settlement agreements, this Court can exercise supplemental jurisdiction over J.R.'s breach of settlement claim.

Defendants cite cases that are not persuasive nor applicable here because the respective courts' found the claims concerning breach of settlement required analysis of "the provision of a [FAPE]." *J.P. Cherokee Cnt. Bd. of Educ.*, 218 Fed. Appx. 911, 913-14 (11th Cir. 2007) ("The instant dispute [a]t its heart, . . . is about a failure to sufficiently provide a [FAPE] to [J.P.] and the adverse educational consequences of that failure. Because J.P.'s alleged injuries *primarily* relate to the provision of his FAPE [plaintiffs needed exhaust].")(internal quotes omitted); *see also, Sch. Bd. v. M.M. ex rel. M.M.*, 348 Fed. Appx. 504, 512 (11th Cir. 2009) (same); *J.M.C. v. La. Bd of Elem. & Secondary Educ.*, 584 F. Supp. 2d 894 (M.D. La. 2008) (finding a "settlement [that] occurred in the interim between the preliminary meeting and the scheduled due process hearing"

not reviewable under 20 U.S.C. § 1415(f)(1)(B)(iii)); *L.D. v. L.A., Unified Sch. Dist.*, No. 16-8588, 2017 U.S. Dist. LEXIS 63473, at *8 (C.D. Cal. 2017) (finding plaintiffs' claims that defendant breached settlement by providing "*inadequate*" behavioral supports required exhaustion because breach claims really addressed the *appropriateness* of services *already provided*) (emphasis added). The cases Defendants rely on are inapplicable here because the courts found the breach of settlement claims implicated substantive FAPE violations.

The court in *L.D.* provided a sparse but clear contrast between a purely contractual claim and a "FAPE claim in disguise." *See L.D.*, 2017 U.S. Dist. LEXIS 63473 at *8. In *L.D.*, the parents alleged the District breached the settlement because it provided inadequate support per the Agreement. *Id*. For the court in *L.D.* to determine if the plaintiff's claims were true, the court had to find that the services did not appropriately address the child's educational needs, rendering the services *inadequate*. *Id.* These are substantive FAPE questions. *Id*. Here, this Court does not need to make a determination as to the adequacy of the services provided, nor do Plaintiffs request that it do so in their pleadings. DE 25 at ¶¶ 255-57. Unlike *L.D.,* in which some services were provided and challenged as inadequate, Defendants failed to provide all services outlined in the settlement agreement. *See L.D.*, 2017 U.S. Dist. LEXIS 63473 at *8; DE 25 at ¶¶ 255-57. The core dispute is whether Defendants failed to provide all the services outlined in the Agreement, not whether they were appropriate. Thus, Plaintiffs do not request this Court analyze whether the services were adequate, but rather if Defendants had an obligation to provide services to J.R. and did not.

Plaintiffs did not allege FAPE violations from before the September 1, 2023, agreement. Thus, this Court has no reason to decide on the applicability of the statute of limitations to claims Plaintiffs never brought, nor does it have the authority to dismiss claims Plaintiffs did not allege in the first place. Plaintiffs seek the value of the settlement agreement in the form of monetary

damages for Defendant's breach of the agreement. DE 25 at ¶ 270. Thus, the Court should deny Defendant's Motion to Dismiss.

## II. Plaintiffs Alleged That J.R. Was Discriminated Against on The Basis of His Disability in Violation of Section 504 And The ADA.

Plaintiffs have stated claims against the Defendant for disability discrimination. The standards for determining violations of Section 504 of the Rehabilitation Act and Title II of the ADA are substantially the same. *See Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995). To succeed on a damage's claim for disability discrimination under either act, a plaintiff must prove the defendant acted with "deliberate indifference." *See Koon v. North Carolina*, 50 F.4th 398, 400 (4th Cir. 2022). Here, the Board's failure to accommodate J.R. was discrimination on the basis of disability. In doing so, the Board acted with deliberate indifference.

### *A. Defendant's Failure to Provide Appropriate Supplementary Aides, Services, and Accommodations for J.R. Constitutes Discrimination on the Basis of Disability.*

Defendants failed to meet their affirmative duty to provide supplementary aides, services, and accommodate J.R. To state a claim for disability discrimination under Section 504 or the ADA, a claimant must show he "has a disability," was "otherwise qualified to get some public program, service, or activity" and "was denied that program, service, or activity on the basis of his disability." *Id*. at 405.

Disability discrimination can be proved through a failure to accommodate. Section 504 and the ADA impose an affirmative duty to make reasonable modifications necessary to avoid unintended discrimination. *See* 28 C.F.R. § 35.130(b)(7); *Seaman v. Virginia*, 593 F. Supp. 3d 293, 322 (W.D.V.A. 2022). Because of this obligation, "[o]ne way to prove the third prong, denial on the basis of disability, is to prove a 'failure to make reasonable accommodations.'" *Koon*, 50 F.4th at 405 (quoting *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016)). Failing

"to make a reasonable modification is itself an act of discrimination. " *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 676 (4th Cir. 2019) (citation omitted). It is the "place of public accommodation['s]" burden to "demonstrate that implementing the modification would fundamentally alter the nature of the program." *Id.*

Here, Plaintiffs adequately alleged that the Board discriminated against J.R. on the basis of disability by failing to provide him with appropriate supplementary aides, services, and accommodations. DE 25 at ¶¶ 272-82. Plaintiffs are not required to allege the Board intentionally discriminated against J.R. to state a 504 or ADA claim. *See Doherty*, 925 F.3d at 676. The Board was required to provide J.R. with accommodations necessary for him to access his education on the same basis as his non-disabled peers. *Id.* Defendant failed to provide J.R. with necessary reasonable accommodations. During the 2023-24 school year, Defendant was in possession of multiple independent evaluations that recommended appropriate, reasonable supplementary aides, services, and accommodations to J.R.'s IEP. *Id*. at ¶¶ 197, 272-82. These accommodations were not implemented despite the Defendant's knowledge that they were necessary. *Id*. at ¶¶ 197, 273. Among these reasonable accommodations was a request for a school-based RBT, which Defendant received and denied. *Id*. at ¶ 273. Plaintiffs' explicitly tie this denial to J.R.'s lack of accommodations. *Id*. at ¶¶ 272-82. Both the RBT and the specific accommodations recommended by private evaluators, were necessary to allow J.R. to access the curriculum. *Id*. at ¶¶ 197, 273. The ultimate consequence of Defendant's failure to accommodate was that "J.R. stopped attending school October 25, 2023, because he was not receiving the accommodations and supports he needed to manage his disability." *Id*. at ¶ 292. Defendant had an independent legal duty to accommodate J.R., which Plaintiffs explicitly alleged was not followed and resulted in unintentionally excluding J.R. *Id*.

### *B. Plaintiffs Plausibly Alleged Defendants Knew That Harm To Federally Protected Right Was Substantially Likely and Failed to Act.*

Plaintiffs plausibly alleged that Defendants knew a federally protected right was substantially likely to be violated when they failed to provide an RBT for J.R. and, despite that knowledge, failed to act. To establish deliberate indifference, Plaintiffs must plausibly allege Defendants had "knowledge that a federally protected right is substantially likely to be violated, and [it] fail[ed] to act despite that knowledge." *Koon*, 50th F. at 405.

Defendants were aware of J.R.'s need for an RBT. DE 25 at ¶¶ 197, 272. Without one, he could not access the educational curriculum. *Id*. Defendant approved a settlement agreement in response to a lawsuit filed alleging J.R. needed an RBT to access the curriculum. DE 25-3. To settle the suit, the Board approved an RBT for J.R. because the Plaintiffs explained that J.R. needed an RBT to access the educational curriculum. *Id*. Defendant also had notice of an evaluation conducted by Jennifer Holmes, which stated that J.R. required an RBT to access the educational curriculum. DE 25 at ¶ 197. Plaintiffs plausibly alleged the Board had sufficient knowledge that J.R. needed a RBT.

Additionally, the Board knew that use of restraints likely resulted in a violation of a federally protected right. First, the Board approved a settlement agreement ten days before a trial in which the Board was aware that Plaintiffs were suing, in part for unlawful restraint of J.R. DE 25-3. Further, the Board was aware of a police investigation lodged by J.R.'s mother. against the school for unlawful restraints against J.R. DE 25-1. Moreover, the Board was aware of an investigation by DRNC started on March 15, 2023, for unlawful restraints of J.R. *Id*. Thus, the Board had ample notice that its employees' use of restraints against J.R. likely violated a federally protected right and it acted with deliberate indifference when it failed to provide an RBT, which it

initially agreed to provide to settle a lawsuit, so J.R. could be free of restraints and attend school. DE 25-3.

## III. Defendant Board Waived Its Governmental Immunity Through The Purchase of Liability Insurance.

Defendant waived its governmental immunity from tort claims when it purchased liability insurance that covered those claims. Section 115C-42 of North Carolina's General Statutes authorizes "[a]ny local board of education" to "waive its governmental immunity from liability for damage[s]." N.C. Gen. Stat. § 115C-42.4. Immunity is waived "by securing liability insurance . . . only to the extent that said board of education is indemnified by insurance for such negligence or tort." *Id.*

Courts must interpret the insurance contract when there is a dispute as to coverage. *See Herndon v. Barrett*, 101 N.C. App. 636, 641 400 S.E.2d 767, 770 (1991). In doing so, the court is "not bound by the insurance company's interpretation of its own policy's coverage." *Wiggins v. City of Monroe*, 73 N.C. App. 44, 50, 326 S.E.2d 39, 44 (1985)(letter from insurance company denying coverage of claim at issue was not dispositive). Insurance contracts are interpreted in favor of extending coverage when their coverage terms are ambiguous. *City of Greenville v. Haywood*, 130 N.C. App. 271, 275, 502 S.E.2d 430, 433 (1998).

North Carolina courts apply the "comparison test" when determining the scope of insurance coverage. *See Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 693, 340 S.E.2d 374, 378 (1986). Under the comparison test, "the pleadings are read side- by-side with the policy to determine whether the events as alleged are covered or excluded." *Id.* Applying this analysis, the exclusions from coverage Defendant claims preserves its governmental immunity do not apply. Moreover, the explicit terms of Defendant's policy waive their immunity defense.

### *A. Plaintiff's Tort Claims Do Not Allege Intentional Injuries.*

None of the torts which Plaintiffs allege require intentional action to accomplish. Assuming *arguendo* that Defendant's argument is correct, Plaintiff's claims for negligent supervision would not be excluded by the insurance policy as a claim for "bodily injury" under North Carolina law.

Negligent supervision is predicated on a different wrong than claims for bodily injury. In *Herndon*, after being assaulted by the police, plaintiff sued three law enforcement officers and the City of Kings Mountain on two theories of liability: 1) direct negligence for the bodily injuries suffered as a result of the officers and 2) negligent supervision by the *City of King's Mountain v. Herndon*, 101 N.C. App. at 642, 400 S.E.2d at 771. The relevant insurance policy had two types of coverage: 1) Coverage A, which applied only to law enforcement officers and excluded any "willful, intentional or malicious conduct," and 2) Coverage B, which applied to the municipality itself, and excluded "any claim related to injury arising from 'bodily injury.'" *Id*. at 641-42. Both Coverage A and Coverage B applied to "any Wrongful Act of the Insured," which included negligent acts. *Id*. Defendant police officers argued that the Coverage A exclusions applied, as the assault involved intentional contact, while the defendant municipality argued that the claim was one involving "bodily injury," so the Coverage B exclusions applied. *Id*. at 642, 771. The Court rejected both of these claims, strictly interpreting the policy and finding that merely alleging negligence was enough to avoid the "willful, intentional, or malicious conduct exclusion" in Coverage A and also holding:

> With respect to the City of Kings Mountain . . . [t]he exclusions applicable would apply to claims for "bodily injury" or injury arising from "false arrest, assault or battery, detention, imprisonment, malicious prosecution or abuse of process." Plaintiff's cause of action against the City of Kings Mountain is also based on negligent supervision. Contrary to defendants' argument, plaintiff's claim does not arise from assault or battery. With respect to the "bodily injury" exclusion, plaintiff's claim is for money damages suffered as a result of defendant City's negligent supervision of the two officers.

*Id*. As such, the exclusions in insurance policies are construed strictly, with "bodily injury"

exclusions specifically distinguished from claims of negligent supervision and intentional conduct not required when "any Wrongful Act" is otherwise given coverage.

Here, Plaintiffs' tort claims against the board are not excluded by the policy. The exclusion in Defendant's policy, applying to claims for bodily injury, is nearly identical to the wording of the exclusion in *Herndon*. DE 30-1 at 19. Both the *Herndon* court and later North Carolina appellate rulings have affirmed the idea that a claim for negligent supervision is not a claim for bodily injury as the Defendant's policy describes. Plaintiffs' negligent supervision claim is premised on a different harm: that Defendant Board failed to supervise its employees properly, just as the City of King's Mountain failed to supervise its police officers. DE 25 at ¶¶ 361-67. Seeking monetary damages for this harm is not equivalent to seeking recovery for bodily injury.

The same logic that applies to Plaintiff's negligent supervision claims applies to Plaintiff's other tort claims. Plaintiff also stated claims for negligence and gross negligence against Defendant. *Id*. at ¶¶ 306-55. Like a claim for negligent supervision, these claims seek recovery for the harm of negligent practices in allowing restraints to occur. *Id*. at ¶¶ 306-55, 361-70. That manner of recovery is identical to the harm the court in *Herndon* discussed: seeking recovery for negligent policies, not bodily injury.

Nor are these other claims barred by the exclusion of intentional conduct. A claim for negligence or negligent supervision does not require intentional conduct. *Patterson v. Worley*, 265 N.C. App. 626, 629, 828 S.E.2d 744, 747 (2019). Nor does gross negligence require purposeful action to accomplish. *See infra* Part IV. In alleging that each of these torts was committed, Plaintiff does not claim that Defendant Board acted with purpose or in a manner sufficient to accomplish an intentional tort. DE 25 at ¶¶ 306-55, 361-70. Rather, much like the similar policy in *Herndon*, Plaintiffs' claims are not barred by Defendant's policy exclusions.

*B. The Explicit Language of the Policy Does Not Preserve Defendant Board's Immunity.*

Defendant's insurance policy does not preserve its governmental immunity. "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written." *Hemric v. Groce*, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (1975). As the court construes the contract, "[i]f the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Id*. In ascertaining plain meaning, courts "must give ordinary words . . . their ordinary meanings." *Internet E., Inc. v. Duro Commc'ns., Inc.*, 146 N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001).

As to the school board and its employees, the Boards' insurance policy contains a clause excluding coverage of any claim for which immunity is available as a defense. The clause specifically provides that it "does not apply to any 'Public Entity Liability' for which any insured would otherwise be immune or have no liability pursuant to an 'Immunity or Tort Cap Law.'" DE 30-1 at 33, 114. Such clauses are not *per se* objectionable. *See Patrick v. Wake Cnty. Dep't of Human Srvs.*, 655 S.E.2d 920, 923-24 (N.C. Ct. App. 2008). This is despite the fact of:

> . . . the arguably circular nature of the logic employed in *Patrick*. The facts are that the legislature explicitly provided that governmental immunity is waived to the extent of insurance coverage, but the subject insurance contract eliminates any potential waiver by excluding from coverage claims that would be barred by sovereign immunity.

*Estate of Earley v. Haywood County Dep't. of Soc. Servs*, 204 N.C. App. 338, 343, 694 S.E.2d 405, 409 (2010). Thus, Defendant would retain immunity only if the subject insurance contract actually eliminates "any potential waiver" through the explicit language of its policy. *Id*.

Here, Defendant's insurance policy does not explicitly preserve Defendant's governmental immunity. The clause only applies if the insured would "otherwise" be immune or have the defense of immunity "available." DE 30-1 at 33, 114. A literal reading of these provisions leads to the

conclusion that the clause does not apply. The insured is not "otherwise" immune because the purchase of insurance has waived that immunity. *Id*. Or, in other words, the clause does not apply because of an exclusion within the clause itself. The clause limits its application to when immunity is "available" and immunity is not available here because the school has sought coverage for tort claims. *Id*. The terms the parties bargained for in this contract specifically limit the application of this limiting clause. *Id*. To retain governmental immunity, in this case, would invalidate the plain meaning of the contract's words and, therefore, the party's intention in making this contract.

Alternatively, the notion Defendant assented to this provision is absurd. The heart of interpreting an insurance contract is affecting the intention of the parties. *Wachovia Bank v. Westchester*, 276 N.C. 348, 354-55, 172 S.E. 2d 518, 522-23 (1970). In *Fulford v. Jenkins*, the North Carolina Court of Appeals decided whether an exclusion eliminating all coverage for the county's governmental functions should be given effect, although the county purchased insurance covering the acts of its public officials. 195 N.C. App. 402, 403, 672 S.E. 2d 759, 762 (2009). Even though the identical exclusion had been enforced previously, the court held that because the county had purchased liability insurance, the doctrine of sovereign immunity was inapplicable. *Id*. The court correctly reasoned that:

> Were we to adopt Defendants' interpretation of the policy, *we would have to assume that Duplin County intended to purchase an insurance policy that provided it almost no coverage*. Because Duplin County is a governmental entity and political subdivision of the State, *if the policy exempts Duplin County from coverage for all of its governmental functions, it is uncertain what acts by Duplin County would be covered under the policy.*

*Id*. at 763 (emphasis added). Similarly, in *Cowell v. Gaston County*, the court voided an insurance company's exclusion in a county's liability policy for "professional services" that applied to all individuals performing professional services, rendering the policy meaningless. 190 N.C. App.743, 744, 660 S.E. 2d 915, 919 (2008). In affirming the trial court's denial of

summary judgment, the unanimous court held that ambiguous blanket-exclusions that leave the insured with no determinate coverage are unenforceable. *Id*. at 919-20.

Likewise, were this Court to adopt Defendant's argument, it would contradict not only the plain reading of the contract text but also the basic intent of the contracting parties. This Court would be bound to accept Defendant's contention that they intended to purchase a policy, likely to the tune of hundreds of thousands of dollars, that provided them with no protection against its principal coverage area: "wrongful acts", i.e., tort claims. As the *Fulford* court recognized, no reasonable party could manifest assent to such a term's inclusion within an insurance contract. Insurance companies do not have the legal authority to render North Carolina statutes obsolete. Such a result allows the exception of immunity to swallow the rule of coverage. As such, Defendant either explicitly provided for coverage of this scenario in their liability insurance policy, rendering them vulnerable to suit, or Defendant agreed to a contractual term which no reasonable party could assent to.

## IV. Plaintiffs Were Not Required to Plead Purposeful Action To State A Gross Negligence Claim.

In North Carolina, an actor need not act with purpose in order for his conduct to be grossly negligent. "In determining or defining gross negligence," North Carolina courts use "the terms 'willful and wanton conduct' and 'gross negligence' interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct." *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001). Gross negligence is "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Id*. (quoting *Bullins v. Schmidt*, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929)(quoted in *Parish v. Hill*, 350 N.C. 231, 239,

513 S.E.2d 547, 551 (1999)). Relatedly, "willful negligence" consists of an act "done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason." *Lea*, 354 N.C. at 52, 550 S.E.2d at 157 (quoting *Foster*, 197 N.C. at 191, 148 S.E. at 37 (citations omitted)).

There is a clear distinction between the mental states required for intentional and wanton action. As the North Carolina Supreme Court explained:

> In strictly accurate use, the terms 'willfullness' and 'wantonness' express different ideas and are clearly distinguishable, the distinction resting chiefly in the nature and extent of intent involved. It has been said that "the difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not.

*Wagoner v. N. Carolina R. Co.*, 238 N.C. 162, 168, 77 S.E.2d 701, 706 (1953). A grossly negligent defendant need not intend to destroy a specific building; they need only to intentionally breach a duty that leads to the building's destruction. *See id*.

Here, Plaintiffs were not required to allege that Defendant's employees' acts amounted to intentional wrongdoing. Plaintiffs only needed to allege that Defendant's employees acted with reckless disregard to J.R.'s safety as they restrained him. Plaintiffs allege that Defendant had been notified that such restraints were not appropriate for J.R. DE 25 ¶¶ 86, 194, 263, 313, 473. Specifically, Plaintiffs had conveyed that these restraints were causing J.R. physical and emotional harm. *Id.* at ¶ 194. Still, Defendant's employees continued to restrain J.R. *Id.* at ¶¶ 266, 362. They did so despite knowing the practice was harming him and would continue to do so. *Id.* at ¶¶ 312-314, 473. Continuing this practice amounts to wanton conduct. Knowing the restraints were harming J.R. and would do so if continued constitutes a conscious or reckless disregard for J.R.'s safety. *Id.* at ¶ 351. Because Plaintiffs alleged that Defendant acted with such reckless disregard, Plaintiffs stated a claim for gross negligence.

## V. Plaintiffs Were Not Required to Identify Specific Employees to State a Negligent Supervision Claim.

While identifying a specific negligent act is a required element of a negligent supervision claim, identifying a specific employee who committed the act is not. In North Carolina, the tort of negligent supervision has four elements:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in "oversight and supervision," . ...; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990)(quoting *Walters v. Lumber Co.*, 163 N.C. 536, 541, 80 S.E. 49, 51 (1913)). In such claims, incompetency includes "a lack of physical capacity or natural mental gifts or of technical training when such training is required" as well as "any kind of unfitness which 'renders the employment or retention of the servant dangerous to his fellow-servant.'" *Walters*, 163 N.C. at 542, 80 S.E. at 52. In its Motion to Dismiss, opposing counsel seemingly misread or misstated the only case it cites for the proposition that alleging negligent supervision requires identifying a specific employee. In *L.C.*, the court did not require the plaintiffs to identify a specific named employee, but the case was dismissed because harassment is not a tort in North Carolina:

> Plaintiff asserts that unidentified employees of defendants made him sit in a hallway without supervision, and wrongfully disciplined him. These claims do not establish any torts under North Carolina law. As defendants note, these allegations appear geared mainly towards plaintiff's Title VI harassment claims, but harassment is not an actionable tort under North Carolina law. See *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 719 (4th Cir. 2003). Additionally and in the alternative, plaintiff fails to identify any inherent unfitness or previous improper acts by any identified employees, as required under the second element. See *Bass*, 327 N.C. at 591.

*L.C. by & through Dunbar v. Charter Schs. USA at Cary, LLC.*, No. 5:24-CV-66-FL, 2024 WL 3470835 at *10 (E.D.N.C. July 19, 2024). The above quotation is the sole reference to unnamed

employees in the opinion, which offers no discussion or conclusions about employee naming—the court only acknowledges the unnamed employee as a matter of fact. *Id*. The phrase "identified" employees in the final sentence does refer to a state law requirement that employees be identified in negligent supervision action, and no such discussion is present in *Bass*. *See Bass*, 327 N.C. at 591. Finally, the only authorities the court cites when discussing unidentified employees are even mentioned does not discuss unnamed employees at all—the employee in *Bass* was even specifically named. See, e.g., *McLean v. Patten Communities, Inc.*, 332 F.3d 714 (4th Cir. 2003); *Bass*, 327 N.C. at 591.

Here, Plaintiffs were not required to identify specific employees to state their claim for negligent supervision. No North Carolina case law requires this level of specificity, and Defendant's only unpublished citation to a similar principle is a misstatement of that case's factual context. Plaintiffs needed only to identify a specific negligent practice that Defendant's employees engaged in. The Amended Complaint specifically identifies these negligent acts as the series of restraints performed on J.R. DE 25 at ¶¶ 3, 7. Though these acts are performed by unidentified employees, Plaintiff identifies the date of each restraint and the student who was restrained, which would allow Defendant to identify the employees in question. *Id.* at ¶¶ 99, 101, 104, 106, 145, 149, 151, 300. Since Defendant takes no issue with any other element of Plaintiffs' negligent supervision claim, it should not be dismissed.

## VI. Severe Emotional Injury to Plaintiffs Nathaniel and Jessica Ryan Was A Foreseeable Consequence of Defendant's Actions.

Plaintiffs have alleged facts that plausibly demonstrate that severe emotional injury to J.R.'s parents was a foreseeable consequence of Defendant's repeated restraints. A claim for the negligent infliction of emotional distress requires that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe

emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Riddle v. Buncombe County Bd. of Educ.*, 256 N.C. App. 72, 74, 805 S.E.2d 757, 760 (2017). Severe emotional distress requires that the plaintiff suffer "an emotional or mental disorder," which can be "any . . . severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Sorrells*, 334 N.C. at 672, 435 S.E.2d at 322. Typically, "[q]uestions of foreseeability and proximate cause must be determined under all the facts presented, and should be resolved on a case-by-case basis by the trial court and, where appropriate, by a jury." *Ruark*, 327 N.C. at 305, 395 S.E.2d at 98. Whether an injury was foreseeable depends upon multiple factors, including the plaintiff's proximity to the injury and if they observed the injury. See *Riddle*, 256 N.C. App. at 75, 805 S.E.2d at 760–61. The existence of "close familial relationships" between a family member and an injured child is another factor that makes emotional injury more likely to be foreseeable. See *Gardner*, 334 N.C. at 435, 435 S.E.2d at 328; *Riddle*, 256 N.C. App. at 77, 805 S.E.2d at 761.

Here, Plaintiffs adequately alleged that severe emotional harm was a foreseeable consequence of Defendant's practice of restraining J.R. Plaintiffs alleged that Defendant's restraints were negligently performed. DE 25 ¶¶ 1, 7. And, J.R.'s parents were severely emotionally disabled by their experience of acute anxiety, guilt, depression, and insomnia, accompanied by physical symptoms. *Id.* N.R. was diagnosed with PTSD as a result of the incident. *Id*. at ¶ 7. While J.R.'s parents were not physically present at the restraint, they have a close, loving relationship with their son. *See id.* J.R.'s parents repeatedly notified the Board that the restraints on J.R. were harmful to both their son and their emotional well-being. *Id*. at ¶ 311. Yet, rather than end the practice, J.R.'s parents had to continually learn that J.R. had once more been restrained at

school. *Id.* at ¶ 313. Given this close relationship and prior history of notice, the fact that severe emotional distress resulted to J.R.'s parents was a foreseeable harm.

## VII. Plaintiffs Suffered A Harm For Which North Carolina Law Has No Adequate Remedy.

Plaintiffs may proceed under the North Carolina Constitution because they lack an adequate state remedy for their claims. A plaintiff with a colorable claim under the North Carolina Constitution without an adequate remedy under state law has "as a direct claim against the State under our Constitution." *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 781, 413 S.E.2d 276, 289 (1992). An adequate state remedy exists where the remedy "provide[s] the possibility of relief under the circumstances." *Craig v. New Hanover County Board of Education*, 363 N.C. 334, 340, 678 S.E.2d 351 (2009). "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Id.* at 339-340. The relief must "meaningfully address[] the constitutional violation." *Washington v. Cline,* 385 N.C. 824, 829, 898 S.E.2d 667, 671 (2024). Ultimately, an adequate remedy "exists when the plaintiff has access to court to raise the constitutional violation, and the court can provide some form of relief for that violation." *Id.* at 829-830.

When a defendant has the defense of governmental immunity available, a state court cannot afford adequate relief for a plaintiff with tort claims. *See Craig*, 363 N.C. at 340, 678 S.E.2d at 355 ("[the] common law cause of action for negligence does not provide an adequate remedy at state law when governmental immunity stands as an absolute bar to such a claim."). Governmental immunity is "more than an affirmative defense," rather, it shields a defendant from the claim altogether. *Estate of Graham v. Lambert*, 385 N.C. 644, 648, 898 S.E.2d 888, 895 (2024). A state court cannot acquire personal jurisdiction over a defendant with a valid governmental immunity defense. *Brady v. Charlotte-Mecklenburg Board of Education*, 299 N.C.App. 560, 564, 920 S.E.2d

180, 188 (2025). While a valid defense of governmental immunity bars state tort suits, it does not bar constitutional claims, and a plaintiff may bring suit "directly under our State Constitution based on the same facts that formed the basis for his common law" claims. *Craig*, 363 N.C. 334 at 340, 678 S.E.2d at 355.

Here, Plaintiffs have no adequate state remedy for the harm that J.R. suffered while enrolled in Wake County Public Schools because his constitutional injury constituted more than his experience of being restrained at school. J.R. was subjected to a hostile educational environment. *Id.* at ¶¶ 311-3, 348. Over several months, J.R. was repeatedly restrained by his educators in the school environment. *Id.* at ¶¶ 311-3. These restraints left lasting emotional harm and physical injuries on J.R. *Id.* at ¶¶ 7, 8, 98. However, these harms were magnified by the overall hostile environment in which J.R. was being educated. *See id.* at ¶ 348 Aside from the restraints, J.R. was placed in an environment in which his special education support was wholly inadequate to meet his complex needs. *Id.* at ¶¶ 87, 338-344, 348. Multiple independent evaluators recommended that the Board adopt necessary accommodations *simply in order for J.R. to be able to access his educational programming*. *Id.* at ¶189. These recommendations were rejected wholesale. *Id.* at ¶190. Moreover, even the existing supports in J.R.'s IEP, inadequate as they were, were not implemented. *Id.* at ¶¶ 179, 292-3, 338, 348, 481. When combined with the Defendant's practice of restraining J.R., the combined effect of these inappropriate supports was to create a hostile educational environment in which J.R. could not learn and from which he was forced to leave. *Id.* at ¶¶ 86, 90.

It was J.R.'s experience of this environment that constituted his constitutional injury. Like the students in *Deminiski*, J.R. was harmed not through single, isolated acts of abuse. *Id.* at ¶¶ 311-3, 348. Rather, J.R. was subject to a pattern of restraints in an environment where he was entirely

unable to access his academic programming. *Id.* at ¶¶ 86, 90. And, just as in *Deminiski*, Plaintiffs have alleged that the Board had adequate notice not only of these incidents of abuse but also of an overall programmatic failure to support J.R. *Id.* at ¶¶ 311-3. Holistically, the experience of this environment was J.R.'s constitutional harm, for which no adequate state remedy, other than *Corum*, exists.

Conversely, should this Court hold that Defendants are entitled to governmental immunity, Plaintiffs have no adequate remedy for the physical injuries and mental distress that J.R. suffered as a result of the restraints. In North Carolina, governmental immunity serves as an absolute bar for Plaintiffs' claims. *See Craig*, 363 N.C. at 340, 678 S.E.2d at 355. Exactly as the Plaintiff in *Craig* was barred from the courthouse doors for their tort claims, J.R. would be unable to recover from Defendant should this Court find that Defendant retained its defense of governmental immunity. *See id.* Thus, should this Court hold that Defendant is entitled to governmental immunity, it should likewise hold that Plaintiffs have no adequate state remedy. Likewise, should this Court hold that Plaintiffs have an adequate state remedy based on actionable tort claims, a theory which Plaintiffs deny and adopt here only *arguendo*, it should not hold that Defendant is entitled to governmental immunity.

## VIII. Plaintiffs Plausibly Alleged That Defendant Board Was Deliberately Indifferent in its Failure to Train or Supervise Its Staff As They Worked With Disabled Students.

Plaintiffs established that Defendant Board was deliberately indifferent to ongoing or likely violations to the constitutional rights of its students. Plaintiffs alleged that J.R.'s Fourteenth Amendment due process rights were implicated by the Board's conduct and that such violations were a highly probabilistic outcome of the Board's failure to train its staff.

### *A. Plaintiffs Plausibly Allege Defendants Conduct Arises to a Deprivation of Plaintiffs Right to Bodily Integrity Under the Fourteenth Amendment.*

The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Students have a right to "freedom from bodily restraint and punishment." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). The Fourth Circuit has held there are "circumstances under which" a school's corporal punishment "gives rise to an independent federal cause of action to vindicate substantive due process rights under 42 U.S.C. § 1983." *Hall v. Tawney*, 621 F.2d 607, 611 (4th Cir. 1980). In such situations, the inquiry is "whether the force applied . . . was so disproportionate to the need presented . . . that it . . . shock[s] the conscience." *Id.* To plausibly claim defendants' actions "shocked the conscious" plaintiffs must allege (1) the child suffered a severe emotional or physical injury, (2) the action was disproportionate to the situation, and (3) was malicious. *See Meeker v. Edmundson*, 415 F.3d 317, 321 (4th Cir. 2005).

In the context of students with disabilities, knowingly restraining or excluding a child in a manner contrary to a students' explicit needs can plausibly show Defendants' actions were disproportionate and malicious. *See H.H. v. Moffett*, 335 Fed. Appx. 306, 313-14 (4th Cir. 2009) (plausible § 1983 claim when teachers restrained disabled child in wheelchair despite accommodations requiring movement because such restraint was blatant disregard for child's movement needs making it malicious and disproportionate); *Brattain v. Stanly Bd. of Educ.*, No. 1:19cv1037, 2020 U.S. Dist. 201123 at *16-17 (M.D.N.C. 2020) (plausible § 1983 claim when teachers placed disabled child seclusion room on multiple occasions for extended periods because seclusion contrary to child's BIP thus disproportionate and malicious). Actual notice a practice is harming the child makes malicious conduct more likely. *See L.P. v. Wake Cnty. Bd. of Educ.*, No. 5:20-CV-481-BO, 2022 U.S. Dist. Lexis 126955 at *18-19 (E.D.N.C. 2022) (plausible § 1983 claim when parents and doctors notified Defendants restraints and seclusions harmed disabled

child, but Defendants continued using restraints and seclusion). Additionally, when state law prohibits the conduct in question, any assertion the act was proportionate or in good faith is untenable. *E.g.*, *Meeker*, 415 F.3d at 324 ([T]he fact that the beatings were not administered pursuant to an established procedure . . .  makes it more, not less, likely that they constitute a malicious abuse of power violative of the Due Process Clause.").

Here, Plaintiffs plausibly allege Defendant continued use of restraints against J.R. "shocks the conscious" to violate his liberty interest in freedom from restraint. First, Plaintiffs plausibly allege J.R. suffered severe emotional consequences. DE 25 ¶¶ 7, 8, 98. Defendants repeated, undocumented, and prolonged restraints of J.R. resulted in PTSD, and a fear of school. *Id.* J.R. himself reported he thought school officials were going to "kill" him whenever he was restrained. *Id.* at ¶¶  265, 325. Next, Plaintiffs plausibly alleged facts that Defendant's use of restraints against J.R. was disproportionate and malicious. *Id.* at ¶ 348. J.R. was seventy pounds and suffered from disabilities that impacted his behavior. *Id.* at ¶¶ 78-81.  Defendants knew that restraining J.R. exacerbated his negative behavioral outbursts, and it was contrary to his education plan. *Id.* at ¶¶ 206-7, 366, 439.  Defendants received recommendations from expert Jennifer Holmes to address and de-escalate J.R.'s aggressive outburst. *Id.* at ¶ 264. Ms. Holmes noted in her report that restraints should not be used against J.R., and if so, as a non-invasive last resort. *Id.* at ¶197. Yet, despite this Defendants continued to use restraints on J.R. for unknown periods of time, exacerbating his behavioral outbursts, leading to his exclusion and refusal to attend school, and resulting in long-term emotional harm. *Id.* at ¶¶ 86, 90, 311-13. Plaintiffs plausibly alleged Defendants' conduct deprived J.R. of his substantive right to bodily integrity.

*B. Plaintiffs Adequately Alleged Defendant's Failure to Train or Supervise Amounted to Deliberate Indifference.*

Plaintiffs alleged that Defendant Board's failure to train or supervise constituted deliberate indifference. A plaintiff can establish the custom or usage element of a § 1983 claim four different ways, "through an express policy, such as a written ordinance or regulation," or "through the decisions of a person with final policymaking authority," or "through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens," or finally "through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Z.G. by & through C.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ.*, 744 Fed. App'x 769, 780–81 (4th Cir. 2018). Given that a state actor's "written policies are carefully crafted to be constitutional . . . a plaintiff must usually prove the existence of some unpublished practice" for liability under § 1983. *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991).

Both failure to train and failure to supervise claims have three elements. For a failure to train claim, the plaintiff must allege "subordinates actually violated the plaintiff's constitutional or statutory rights," that a "supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of" others, and that the failure to train caused the violation. See *Brown v. Mitchell*, 308 F. Supp. 2d 682, 701-2 (E.D.V.A. 2004)(citing *City of Canton v. Harris*, 489 U.S. 378, 388-92 (1989). The three requirements of a failure to supervise claim are substantially the same, requiring allegations

> That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Ayala v. Wake Cnty.*, 2025 U.S. Dist. LEXIS 101171 at *9 (M.D.N.C. May 28, 2025)(quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

In a failure to train or supervise case, alleging a long history of state actor abuse is only one manner of demonstrating deliberate indifference. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61-62. "Generally, a failure to supervise gives rise to § 1983 liability . . . only in those situations in which there is a history of widespread abuse." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) . "A single act or isolated incidents are *normally* insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Id*. (emphasis added).

Some individual acts of abuse are sufficient to implicate § 1983. Isolated acts may be the basis for municipal liability where it arises from a municipal policy of inadequate training or supervision "so grossly negligent as to constitute 'deliberate indifference.'" See *id*. (citing *Owens v. Haas*, 601 F.2d 1242, 1247 (2nd Cir. 1979)). Absent proof of pattern, when a constitutional injury is the highly predictable consequence of a policy of *not* providing necessary training, deliberate indifference may be established when foreseeable harm occurs. See *Canton*, 489 U.S. at 390 & n.10 ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms . . . [t]hus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as deliberate indifference.")(cleaned up). "[T]he unconstitutional consequences of failing to train [can] be so patently obvious that [an actor] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In these situations, the municipal entity must have "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 396 (O'Connor, J.,

concurring); *see also Drake v. City of Haltom*, 106 F. App'x 897, 900 (5th Cir. 2004)(in such situations "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train.").[1]

These different methods of proving deliberate indifference reflect different sufficient, though not necessary, criteria for alleging separate theories of § 1983 liability. In light of the practical necessity of alleging the existence of an unpublished policy or custom, "two theories [of liability under § 1983] predominate." *Knopf*, 942 F.2d at 269. "The principal theory locates fault in deficient programs in . . . training and supervision which are claimed to have resulted in constitutional violations. *Id*. (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987), *cert. denied*, 484 U.S. 1027 (1988)). But, "[a] second theory, *sometimes imprecisely subsumed under the first*, locates fault in irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by [state actors] of which the specific violation is simply an example." *Id.*

Here, Plaintiffs have alleged failure to train or supervise. Plaintiffs have established that Defendant had such a history when applied to its restraints of J.R., and that Defendant had actual notice that this practice was ongoing. *Id*. at ¶¶ 311-3. A complaint filed in April 2023 named unlawful restraints as an issue in the school, specifically as the practice was applied to J.R. *Id.* at ¶ 235. This complaint led to a settlement offer on September 1, 2023. *Id.* at ¶ 236. Both of these documents should have notified Defendant that an issue existed with respect to restraints. See *id.* at ¶¶ 235-6. Further, Defendant would have been aware of the DRNC investigation that started on March 15, 2023, and probed Defendant's practices surrounding restraints. *Id.* at ¶¶ 3-4, 103; *see*

[1] Likewise, "the conduct of the boards may be actionable if their failure to promulgate policies and regulations" necessary to protect constitutional rights "rose to the level of deliberate indifference." *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

also DE 25-1. These multiple investigations and complaints lodged against Defendant during the 2023-2024 school year would have notified Defendant that restraints were substantially likely to violate federally protected rights. *See id.* at ¶¶ 3-4, 86, 103, 235-6. Thus, Defendant would have had actual knowledge of an ongoing or likely issue with respect to unconstitutional restraints in its public school system.

Moreover, Plaintiffs only need to show an isolated act that arises from an official policy of inadequate training so grossly negligent as to constitute deliberate indifference. Defendant's staff were required to routinely interact with children with disabilities. *Id.* at ¶¶ 4, 262, 276, 469. Multiple independent experts recommended against the restraints of such children, and that training be provided to staff and parents on restraints. *Id.* at ¶¶ 197, 264, 276. No adequate training was adopted. *Id.* at ¶¶ 361-69

This failure to adopt adequate training amounted to deliberate indifference on the part of the Defendant. Defendant's failure to train its staff amounts to deliberate indifference if a constitutional injury is the highly predictable consequence of a policy of *not* providing necessary training. *See Connick*, 563 U.S. at 61. Defendant's staff, as educators of students with special needs, were routinely required to interact with students with behavioral needs. *Id.* at ¶¶ 4, 262, 276, 469. The behavioral challenges of these students occasionally require that such students be restrained. *See*, e.g., N.C. Gen. Stat. § 115C-391.1 As such, the Defendant knew, to a moral certainty, that its staff would need to restrain a certain population of students who are especially vulnerable to harm. *Id.* at ¶¶ 99, 109. Without adequate training in how to conduct these restraints, constitutional injury to these students, including a violation of their right to bodily integrity, is highly predictable. *See Canton*, 489 U.S. at 390 & n.10. Given this foreseeable situation: repeated

restraints, vulnerable students, the Board's failure to provide training to its staff, as alleged by Plaintiffs, amounted to deliberate indifference.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court DENY Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) and allow all of Plaintiff's claims to proceed to trial.

Respectfully submitted this the 13th day of April 2026.

BY: THE LAW OFFICES OF KEITH L. HOWARD, PLLC

/s/Keith Howard
Keith Howard
Attorney at Law
NC Bar # 32258
19109 W. Catawba Ave. Ste. 200
Cornelius, NC 28031
Email: keithh@khowardlaw.com
Telephone: 704-612-4151
Fax: 1-800-341-3931
Attorney for Plaintiffs

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document, Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss, complies with Rule 7.2(f) of the Local Rules.

This the 13th day of April 2026.

BY: THE LAW OFFICES OF KEITH L. HOWARD, PLLC

/s/Keith Howard
Keith Howard
Attorney at Law
NC Bar # 32258
19109 W. Catawba Ave. Ste. 200
Cornelius, NC 28031
Email: keithh@khowardlaw.com
Telephone: 704-612-4151
Fax: 1-800-341-3931
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on April 13, 2026, I electronically filed the foregoing **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** using the Court's CM/ECF system, which will affect service on all registered participants:

David B. Noland, N.C. Bar No. 53229
Jack F. Salt, N.C. Bar No. 62640
THARRINGTON SMITH, L.L.P.
150 Fayetteville Street, Ste 1900
Post Office Box 1151
Raleigh, North Carolina 27602
Telephone: (919) 821-4711
Fax: (919) 829-1583
Email: dnoland@tharringtonsmith.com
jsalt@tharringtonsmith.com
Attorneys for Defendant Wake County Board of Education

Stephenson Harvey, Esq.
NC State Bar No.: 56855
The Harvey Law Group, PLLC
P.O. Box 434
Dunkirk, MD 20754
O:202-291-2914
F: 888-858-1941

Attorney for Plaintiffs

This the 13th day of April 2026.

/s/Keith Howard
Keith Howard, Esq.
NC State Bar No. 32258
19109 W. Catawba Ave., Ste. 200
Cornelius, NC 28031
Telephone: (704) 612-4151
Facsimile: (800) 341-3931

Email: keithh@khowardlaw.com
Attorney for Plaintiffs